(113 App. Div. 696.)

### HAINES v. BARBER et al.

(Supreme Court, Appellate Division, Second Department.   June 27, 1906.)

1. PLEDGES—ENFORCEMENT—SALE—ACTION TO SET ASIDE—EVIDENCE.
   Evidence in a suit to set aside a sale of a pledge given as security for payment of the note *held* insufficient to sustain a finding that plaintiff had reasonable ground for belief that his note would be renewed or extended.

2. ESTOPPEL—BY SILENCE.
   One to whom a letter is written asking for extension of a note is not estopped by failure to answer; he being under no duty to speak.
   [Ed. Note.—for cases in point, see vol. 19, Cent. Dig. Estoppel, §§ 285–287.]

3. CONTRACTS—BREACH OF CONDITION—RIGHTS OF PARTIES.
   Plaintiff, the purchaser of shares of stock, the seller of which agreed to repurchase them at an advance at the end of two years, provided plaintiff had paid a note at maturity, having through his own fault failed to pay the note at such time, can have no relief in equity against the maker of the contract, or one who on the same condition guarantied performance of the contract.

Appeal from Special Term, Westchester County.

Action by Franklin Haines against Amzi L. Barber and others. From a judgment for plaintiff, defendants appeal.   Reversed, and new trial granted.

Argued before HIRSCHBERG, P. J., and WOODWARD, JENKS, GAYNOR, and RICH, JJ.

Henry B. Johnson, for appellant Barber.

Louis L. Babcock, for appellants Albright, Marine Nat. Bank of Buffalo, and Hollister.

Abraham Benedict (Samuel Untermyer, on the brief), for respondent.

JENKS, J.   The written agreement of February 9, 1904, whereby the defendant Barber, Carner, and the Pan-American Company compromised and settled their disputes and differences, provided that four prior contracts should be canceled, the actions based thereon should be discontinued, releases should be exchanged, and certain notes should be canceled.   It provided for the sale by Barber and Carner to plaintiff of certain shares of the Pan-American stock for $31,576, to be paid by the surrender and cancellation, as paid by him, of a $10,000 note

and a $20,000 note. It provided that Barber should purchase this stock of the plaintiff at the end of two years at 20 per cent. advance of the purchase price paid by plaintiff, "provided, however, that the plaintiff shall have paid the note delivered by him to take up the $20,000 note above maintained at the expiration of one renewal thereof." The $20,000 note was taken up by a note for that amount, dated February 9, 1904, indorsed by plaintiff and his father, and by a check for $893.34, and an agreement was made with the defendant Albright whereby he agreed to procure the acceptance of the last-named note by the bank for the old note, and also its renewal upon five days' notice. Plaintiff agreed to secure Albright against the payment of the note by deposit of the said Pan-American stock, and Albright guarantied Barber's performance of his said contract to purchase the stock at plaintiff's option, provided plaintiff should have paid the note "at the expiration of the renewal hereinabove provided for." The old note was taken up and canceled upon the delivery of the new note, and the stock was deposited with Albright as collateral, with his right of sale thereof upon default. The settlement was a formal matter and the various parties were represented thereat by counsel. The note was renewed once, and on maturity of the renewal, August 9, 1904, it was neither paid by the plaintiff nor again renewed. On October 28, 1904, the plaintiff received a demand from Albright for the amount due, with notice that in case of his failure the collateral would be sold to the highest bidder at a designated hour, day, and place. The plaintiff did not pay. The collateral was sold accordingly to the defendant Hollister, and thereafter the plaintiff was notified thereof, of application of the price realized to the note, and of an institution of an action for the balance. The plaintiff then began this action against Barber, Albright, the bank, and Hollister, praying for a judgment against the forfeiture of the stock and of his rights under the agreement, declaring the agreement in full force, setting aside the sale, for the return of the stock upon payment of the sums due upon the note, with accrued interest and the expenses of the sale, restraining Albright and the bank from suits upon the unpaid balance of the note, or from transferring the note, restraining Albright and Hollister from parting with the said stock, and Barber and Albright from declaring a forfeiture of their agreements. The learned Special Term gave judgment accordingly. The basis of the complaint is that the plaintiff, some time before the maturity of the $20,000 note as renewed, requested another renewal; that he was never refused such renewal, and that Albright personally, and as the representative of Barber, demeaned himself so that the plaintiff in good faith believed that either the renewal would be granted, or he would receive an extension of payment sufficient to enable him to raise the money to meet the note, and so save himself from the loss of the stock and the forfeiture of the agreement. The complaint also alleged that the defendants conspired to mislead the plaintiff, so as to cause his default and the forfeiture of his rights.

The judgment rests upon these two findings:

"(12) The plaintiff was not guilty of any culpable neglect in making said default, and believed on reasonable grounds up to the date of the ma-

turity of his note, and after the date at least until the sale of the collateral by the defendant Albright, that his request for an extension of time were being entertained by the defendants Albright and Barber and were receiving consideration. (13) The plaintiff's default was caused by accident and surprise, and the conduct of the defendants Albright and Barber in failing to notify the plaintiff that his requests for an extension of time were rejected, and that they would insist upon payment of his note at maturity was inequitable, and misled the plaintiff, to his injury."

I think that the evidence falls far short of sustaining them. The plaintiff does not pretend that there was aught to justify his belief that there would be a renewal of the $20,000 note or an extension thereof prior to July 29, 1904. When on that day he went to Buffalo to see Albright, he understood that he had received the renewal of the note provided for in the agreement; that under the agreement the note was due on August 9th; that there was no agreement for any further renewal of the note, and that any renewal or extension would be a matter of favor, not of right. His testimony of the interview with Albright is:

"I told him I had spent a large amount of time and effort in visiting the different banks in New York, and stated what banks I had visited with this guaranty. I had gone to the Seaboard Bank, and seen Mr. Thompson, the cashier. I had seen John D. Crimmins, of the City Trust Comptany; Mr. Loomis, of the City Bank, and I also went to the Fifth Avenue Bank and the Irving Bank, and presented this guaranty, and they simply said, no. they could not do it. One and all had the same reply, 'If you can get this in such shape that we can handle it'—this guaranty in the form of a note. I told Mr. Albright that. Then I asked him, 'Will you give me a note of Mr. Barber or the Pan-American Company, which you will indorse instead of this guaranty, or something that I can handle; something that I can offer to the banks that I know?' He said, 'I could not do that without speaking to Mr. Barber about it. Mr. Barber is in Europe, and will be home in a few days.' I said: 'Have you any objection to my going to the bankers in Buffalo, and offering this contract as security? He replied, 'None whatever; go ahead.' I told him I had an interest in a large amount of property, and that I was simply property poor, and that I could not without sacrificing matters pay such a thing, and that I did not think it was a fair deal, and I could not pay it, and that was the long and short of it. Q. He said he would have to wait until Mr. Barber came back? A. Yes. I went over to the Fidelity Company in Buffalo, and to the Merchants' & Traders' Bank, and they both spoke very highly of Mr. Albright from a financial point of view, but they said it was not commercial paper."

I have thus quoted in extenso because this is all of the direct evidence adduced by plaintiff of his dealing with Albright or any other prior to the maturity of the note, save a single letter and its answer, which I shall consider presently. The plaintiff testifies that they never met again with reference to the matter. Analysis of this testimony of the plaintiff shows that he did not testify that he then asked for a renewal. He complained of his inability to meet the note, and that he could not realize upon the guaranty for a repurchase of the stock. He detailed his vain efforts to do so, and asked in place of the guaranty a note of Barber or of the company, indorsed by Albright, or something that he could offer to the banks. Albright was under no obligation, of course, to vary the agreement. He did not promise to substitute the note asked for, or any other obligation. He said that he could not do that without speaking to Barber. That was an entirely natural answer. He did not, in so many words, say even that he would sub-

mit the matter to Barber, and thus undertake the affair to the relief of the plaintiff. All that he said was that he would have to wait until Barber came back. I fail to see how the plaintiff was warranted upon reasonable grounds in believing that his note would be renewed because Albright, upon the proposition for the substitution of a note for Barber's guaranty indorsed by Albright, said the things that the plaintiff testifies were said. Such a belief is more indication of a sanguine temperament than a deductive mind. I may say that Albright testifies that the plaintiff did then ask for an extension, and that he refused it absolutely and without qualification. On the afternoon of that day the plaintiff wrote to Albright that he had failed in his subsequent quest to borrow upon the guaranty, and then asked if, "without prejudice of the contract or the bond," dated February 9, 1904, there could be an extension of the payment of the note for three months on his own immediate payment of $5,000 cash and a renewal for $15,000; stating that he would send such a note by bearer, together with a check for the $5,000 and another for interest, and further writing that if on Barber's return Albright would give him Barber's note indorsed by Albright, he could have it discounted, even though drawn for a year and three months, for the amount of the bond, $37,892, so as to take up the proposed $15,000 note, and adding that Albright could send to him the $20,000 note due August 9, 1904, when he had used the $15,000 note in substitution. On the same day he received a written answer from Albright's secretary that Albright had left the office at noon and was not expected back, and that, as Albright was to leave town early in the morning, the time is too short for him to take up the subject-matter of the letter. This answer was not one that afforded the plaintiff reasonable ground for a belief that there would be a renewal or an extension. It was not written that the matter would be held for consideration or that it ever would be entertained. The answer was a refusal with a reason, instead of a naked refusal, but without any suggestion of any further consideration. The plaintiff did nothing further in any way before the maturity of the note. He did not even so much as inquire anything of anyone. I fail to see aught of commission or ommission on the part of Albright prior to the maturity of the note that sustains the plaintiff's plea. The plaintiff received no assurance or promise whatever of a renewal or an extension at the interview, and he received on the same day a refusal to entertain his written proposition, which embraced a renewal or an extension. It is significant that, although in his subsequent correspondence the plaintiff complains of the "hardship" of the case, and several times writes at length the reasons why he should receive consideration—at one time by a restoration of conditions, at another by the substitution of a new note with further security, at another for an adjustment on equitable basis, and at another for an extension of the time of sale of the collateral—he never mentions in any of his communications that he had been misled or deceived or lulled into security, or that he had relied upon aught that Albright or any other had said or done or had omitted to say or to do for his belief, or that he had the belief, that the note would be renewed or his time extended. Nor did he ever call upon Johnson as Albright's attorney or Albright for any answer

to his alleged proposition made in that interview, which he now maintains he believed was under advisement; and, even though more than once he called attention to the interview with Albright, with its details, he does not even suggest that any act or ommission of Albright's, or of any other, had induced him to rely on a renewal or an extension.

Subsequent to the maturity of the note, the plaintiff addressed several communications to Johnson, an attorney whom he knew, and whose firm had transacted legal business for him. Johnson, as the plaintiff well knew, had acted in these matters for Albright and Barber. He repeatedly told the plaintiff that he must be considered in this matter as their attorney, and that all that he could do was to communicate the requests and propositions made to him to his clients. The burden of these communications was that the plaintiff wished and intended to pay the note; that he would do so if he could; that he could, then or later, pay something on account; and that he desired some substitute for the guaranty which he could use as collateral. He also explained the financial pressure on him, and expressed his confidence to discharge the obligation if the defendants would substitute a note for their guaranty agreement. Nor is there aught in any answer made to these communications that affords any ground for the belief that the defendants had any idea of grace or concession or release of the defendants' contract rights. Johnson writes in answer that he can but submit the communication to his clients, and again that he has done so, with the information that he is informed that Albright is in the Adirondacks, and therefore he has no answer from him as yet. On October 29th the plaintiff is served with a demand by Albright for payment by November 11th of the note past due, and in default thereof of a sale at public vendue on that day at a stated time and place. Certainly there is nothing which happened between the maturity and the notice of sale to afford any "reasonable ground" for plaintiff's belief that his note would be renewed or extended, and certainly the demand and the note of sale in case of default was a definite, formal, positive expression on the part of the defendant, not to be mistaken. Thereafter several communications were addressed to Johnson and Albright, containing propositions to restore the conditions existing before maturity in consideration of the giving of additional security, and the making of a new note for the balance, with a partial payment, if possible, before its maturity. Mr. Johnson answered that he would submit the proposition to Albright. Albright answers not at all, although the plaintiff is insistent for a personal interview or an answer, until finally his counsel writes on his behalf that there is no reason for any new arrangement, but if there be any proposition for payment, or a postponement thereof on adequate security, the counsel will be glad to hear it. "In cases of silence there must not only be the right but the duty to speak before a failure so to do can estop the owner" (N. Y. Rubber Co. v. Rothery, 107 N. Y. 310, 14 N. E. 269, 1 Am. St. Rep. 822), and he who holds his words must be conscious that thereby he works a fraud (Collier v. Miller, 137 N. Y. 332, 33 N. E. 374). Thus I fail to find in this record sufficient evidence that warranted a reasonable belief at any time on the part of the plaintiff that any concessions from his formal obligation would be made to him by any one

in any way at any time whatever. Nor do I find that he ever indicated such belief by any expression before he began this action.

Equity cannot make a new contract for these parties, and, even if under the agreement the plaintiff may be regarded as the purchaser of the stock, yet the guaranty to repurchase was expressly conditioned, "provided, however, the said Haines shall have paid the note to be delivered by him to take up the $20,000 note above mentioned at the expiration of one renewal thereof," and this condition is repeated in the guaranty of Albright. So far, then, as his right to avail himself of the guaranty is concerned, it did not exist until after he had paid the note. The stock was sold under his pledge thereof, and he would now avoid the sale on the ground of a forefeiture, although he had failed at the time of the sale to perform the express condition which alone entitled him to avail himself of the guaranty. The plaintiff understood all this. In his final letter to Albright he writes:

"Under your guaranty contract, which probably has become vitiated through my inability to pay the note at its maturity, you were to pay me $37,892, on February 9th, 1906."

This is not a case, then, where the plaintiff through forfeiture was deprived of an existing property right, but rather one where through failure to perform his own obligation he had not secured any property right, and yet, complaining of a forfeiture, he offers now to secure the property right provided the forfeiture be set aside. It cannot be assumed that the substance of the guaranty was the mere ownership by the plaintiff of the stock at any time previous to his right to avail himself of it. Non constat, that the payment of the note of $20,000 when it fell due was an essential consideration as definitely expressed. The plaintiff would, in effect, have the court recast the guaranty by exercising therefrom an express condition, namely, the payment of his own note. It is contended that this condition is of no moment. But the relief prayed for by the plaintiff is not merely a discharge of his debt by a present payment, but also a restoration of the guaranty, which the guarantor may rightly insist should be strictly construed. Baylies on Sureties and Guarantors, p. 297; Barns v. Barrow, 61 N. Y. 39, 19 Am. Rep. 247. Pomeroy in his Equity Jurisprudence (3d Ed. § 826) writes:

"As a general rule, where the obligation arises from an express contract created by the stipulations of the parties, and a nonperformance is wholly the result of accident, or a party without fault has been accidentally prevented from completing the execution of the agreement, and deriving full benefits therefrom, in either case equity does not exercise its jurisdiction to give him any relief, whether by way of defense against the enforcement of the obligation, or by way of affirmative remedy. The exception is confined to agreements providing for a penalty or a forfeiture, in which the jurisdiction to relieve is settled within defined and narrow limits."

In Noyes v. Anderson, 124 N. Y. 175, 26 N. E. 316, 21 Am. St. Rep. 657, the court said (per Bradley, J.):

"This relief will not be afforded in cases where the default and forfeiture have been occasioned by the willful neglect of the party seeking it. Nor will it ordinarily be given where the breach is of a condition precedent, although that rule may not be without exception.

In People's Bank v. Mitchell, 73 N. Y. 406, the court (per Miller, J.) say (at pages 414–416) :

"So, also, in case of mistake, accident, fraud, or surprise, relief may be obtained in equity; but the rules stated, which are sometimes invoked to prevent injustice, have no application where, as in the case at bar, the mode of determining the rights of the lessor or his assigns to a new lease or to payment for his building are expressly provided for, and the liability of the defendant as specified is dependent upon the performance of conditions precedent which have not been performed. There is no ground upon which a court of equity should intervene to relieve the lessee from the consequences of a failure or neglect to perform. 4 Kent, Com. 125, note c. (11th Ed.) ; Wells v. Smith, 7 Paige, 22, 31 Am. Dec. 274."

See, too, Nelson v. Stephens, 107 Wis. 136, 82 N. W. 163.

The judgment must be reversed, and a new trial granted; costs to abide the final award of costs. All concur.